**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

**IN RE**

**NATHAN CHRISTOPHER PAUL WORKMAN** — **CASE NO. 25-51824**

**SARAH ELIZABETH WORKMAN**

**DEBTORS** — **CHAPTER 7**

## MEMORANDUM OPINION AND ORDER ON MOTION TO DISMISS CASE FOR ABUSE

On December 18, 2025, Debtors Nathan and Sarah Workman filed a petition for chapter 7 relief. [ECF No. 1.] On March 4, 2026, the United States Trustee ("UST") filed a Motion to Dismiss Case for Abuse under 11 U.S.C. § 707(b). [ECF No. 24 (the "Motion").] Debtors filed a Response opposing the Motion. [ECF No. 27.] The Court entered an Order setting an evidentiary hearing. [ECF No. 30.] The evidentiary hearing occurred on September 10, 2026, and the Motion is ripe for disposition. As explained below, unless Debtors convert their case to chapter 13 within fourteen days, the UST's Motion will be granted, and the case will be dismissed.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

The parties filed joint stipulations [ECF Nos. 38, 45] that establish certain undisputed facts. Those stipulations and the Court's findings of fact based on evidence introduced at the hearing are detailed below. In reaching these findings and the legal conclusions based thereon, the Court has considered all of the parties' stipulations, evidence, and the arguments of counsel, regardless of whether they are referred to specifically herein.

Since 2018, Debtor Nathan Workman has worked as a software engineer for five different employers. His job changes occurred due to instability inherent in the software field as innovations, including the development of artificial intelligence, have pushed his employers to

downsize their workforces and rely more on automated services. Debtor Sarah Workman works in the home and earns no income.

After being laid off in early 2025, Nathan was unemployed for several months. He only received unemployment compensation for a portion of this time. Debtors were forced to cut back on expenses to stay afloat and sold one of their vehicles to make ends meet. Since September 2025, Nathan has been employed at APAX. Despite this new employment, their financial situation was still precarious, leading them to file for bankruptcy relief.[1]

Nathan currently earns a gross bi-weekly salary of $5,165, or $134,290 per year. [ECF No. 38 at ¶¶ 1 and 3.] In addition, since filing for bankruptcy, Nathan "received $1,462.24 on June 12, 2026, representing 50% of a variable Q1 profit-sharing distribution. The amount depends on company performance. The remaining 50% is withheld until year-end and is payable only if the company meets its annual profit target across all four quarters. Future profit-sharing payments are not guaranteed." [*Id.* at ¶ 2.] On August 21, 2026, Nathan "received a second quarterly bonus payment . . . in the gross amount of $244.70." [ECF No. 45 at ¶ 37.] Nathan was not eligible to receive these profit-sharing payments until after Debtors filed for bankruptcy, and he received payments in the only two quarters in which he was eligible to do so.

As for their monthly expenses, Debtors pay $1,550 for rental/home ownership expenses, $28.58 for renter's insurance, $250 for electricity, heat, and natural gas expenses, and $100 for water, sewage, and garbage collection. [ECF No. 38 at ¶¶ 16-20.] They pay $133.68 for internet use, $75 for their cell phones, $27.39 for streaming services, $17.33 for YouTube Premium, $59

[1] Debtors' employment income for 2025 through the petition date in December was $47,500. Their income for 2024 was $186,241. A credit card collection lawsuit was filed against Nathan in 2025. [ECF No. 12 at 31-33.] Debtors' general unsecured claims total $174,372.22 and are primarily student loans, credit card debt, and medical debt. [*Id.* at 11-23.] The Court may take judicial notice of records in its own docket. *See* FED. R. EVID. 201, *made applicable by* FED. R. BANKR. P. 9017.

for life insurance, and $106 for vehicle insurance.[2] [*Id.* at ¶¶ 21-26.] Debtors own a 2019 Toyota RAV4 that has approximately 60,000 miles, is in good condition, and does not require any non-routine maintenance. [*Id.* at ¶ 6.] Debtors have not made the $467.93 monthly payments for their vehicle while in bankruptcy. [*Id.* at ¶ 7.] Nathan and Sarah pay Baptist Health $300[3] and $188 per month, respectively, toward their outstanding medical debt. [*Id.* at ¶¶ 14-15.]

In addition to these expenses, "Debtors' 2022 federal income tax return reflects an amount owed of $1,631. A Kentucky Department of Revenue notice reflects a 2022 state income tax balance of $2,578." [*Id.* at ¶¶ 27-28.] Further, "Debtors entered into a post-petition fee agreement with Atkinson, Simms & Kermode, PLLC for routine bankruptcy services totaling $2,200, payable in ten monthly installments of $220" with the last payment due in October 2026. [*Id.* at ¶¶ 29-30.] Sarah and Nathan are responsible for monthly student loan payments of $178 and $130, respectively, which is unsecured debt. [*Id.* at ¶ 31.] Finally, Nathan states he will need to spend $762 for oral surgery scheduled for September 2026 and expects to pay $4,330.20 for post-operative visits. [*Id.* at ¶¶ 33-34.]

Most of these expenses and Debtors' income are reflected in their most recent Schedules I/J. [ECF No. 33.] Debtors report Nathan's monthly take-home pay is $8,051.87, which does not include any potential bonuses Nathan may receive. Debtors also report incurring total monthly expenses of $8,005.58, for a total disposable monthly income of $46.29. Most relevant for present purposes, Debtors' Schedule J lists the following monthly expenses: $940 for medical

---

[2] Debtors previously claimed slightly higher life and vehicle insurance payments. [ECF No. 33 at 5.] The parties stipulated to adjusted figures, which the Court adopts for the purposes of this Memorandum Opinion.

[3] The parties stipulated that Nathan has an agreement to pay Baptist Health $226 per month. [ECF No. 38 at ¶ 14.] The UST's Exhibit 15 indicates this monthly amount had increased to $250 by July 2026. [ECF No. 39-15.] At the evidentiary hearing in September, Nathan testified this monthly payment recently increased to $300, contradicting the parties' stipulation, and the UST did not challenge this testimony. The Court accepts the $300 monthly figure given Nathan's testimony.

and dental expenses; $150 for their 2022 federal income taxes; $150 for 2022 Kentucky income taxes; $178 for Sarah's student loan; $130 for Nathan's student loan; $600 for an anticipated payment on a second vehicle; $125 for childcare and children's education costs; and $200 for entertainment expenses.

Per its independent duty to review chapter 7 cases for potential abuse, the UST conducted its own investigation of Debtors' financial status, which led to the Motion. Specifically, the UST contends Debtors' chapter 7 filing was abusive under the totality of their financial circumstances and that, if Debtors reined in their excessive spending, they would be able to make a sizeable distribution to creditors in a chapter 13 case. [Motion at 7.]

After the parties filed pre-hearing submissions [ECF Nos. 38-42, 44-46], the Court conducted an evidentiary hearing. The UST presented testimony from John Todd Wright, a bankruptcy auditor with the UST's Office. Debtors also testified at the hearing. Pertinent factual findings based on the testimony are contained in this section and in the Analysis section below as appropriate. The Court generally found all three to be credible witnesses.

The testimony centered on three major points: (a) whether Nathan's potential future bonuses should be included with his base salary to determine Debtors' projected monthly income; (b) whether Debtors' scheduled expenses are accurate and, if inaccurate, what adjustments are appropriate; and (c) whether, if adjustments to Debtors' scheduled income and expenses are made, Debtors have sufficient monthly disposable income to contribute to a chapter 13 plan, such that remaining in chapter 7 would be an abuse of the bankruptcy system. After hearing the testimony and the parties' arguments, the Court took the matter under advisement.

## II. JURISDICTION.

The Court has jurisdiction over this matter. 28 U.S.C. § 1334(b). Venue is proper in this District. 28 U.S.C. § 1409. This is a core proceeding. 28 U.S.C. § 157(b)(2)(A). This

Memorandum Opinion constitutes the Court's findings of fact and conclusions of the law in accordance with Federal Rule of Bankruptcy Procedure 7052.[4]

## III. ANALYSIS.

### A. Standard of Review.

Section 707(b) of the Bankruptcy Code states:

> After notice and a hearing, the court . . ., on a motion by the United States trustee, . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b)(1). The UST contends granting Debtors chapter 7 relief would constitute abuse based on the totality of their financial circumstances. Section 707(b) also provides:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider—
>
> . . .
>
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal service contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3)(B). Prior to the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), a dismissal under this subsection required a showing of "substantial abuse," but now it only requires a showing of abuse. However, "the pre-BAPCPA case law remains intact when reviewing the totality of circumstances under subsection 707(b)(3)(B)." *In re Fryerson*, 662 B.R. 325, 333 (Bankr. W.D. Tenn. 2024).

---

[4] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* FED. R. BANKR. P. 7052; *see also In re Clearwater Nat. Res., LP*, No. 09-70011, 2011 WL 6282997, at *1 n.2 (Bankr. E.D. Ky. Dec. 6, 2011) (citing Rule 7052 and stating: "[W]hen appropriate, all findings of fact shall be construed as conclusions of law, and all conclusions of law shall be construed as findings of fact.").

In the Sixth Circuit, *In re Krohn*, 886 F.2d 123 (6th Cir. 1989), remains the seminal case for a § 707(b) totality of the circumstances analysis. As explained in *Krohn*:

> In determining whether to apply § 707(b) to an individual debtor, then, a court should ascertain from the totality of the circumstances whether he is merely seeking an advantage over his creditors, or instead is "honest," in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings, and whether he is "needy" in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets. . . . Substantial abuse can be predicated upon either lack of honesty or want of need.

*Id.* at 126 (citation modified). To make this determination, the Sixth Circuit instructed courts to assess a debtor's ability to repay his debts out of his future earnings and consider

> whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities.

*Id.* at 126-27. However, a debtor's ability to repay his debts out of his future earnings is enough by itself to warrant dismissal. *Id.* at 126. "Under subsection 707(b)(3), the movant has the burden of proof, and the standard of proof is preponderance of the evidence." *Fryerson*, 662 B.R. at 334.

"For purposes of § 707(b)(3), an assessment of a debtor's ability to pay is normally made by looking to the amount of 'disposable income' a debtor has available." *In re Scarberry*, 428 B.R. 403, 407 (Bankr. N.D. Ohio 2009). "The determination as to the amount of 'disposable income' available to a debtor, when assessing their ability to repay their debts, is made exclusively by the court, and is thus not dependent on the financial figures put forth by the debtor or any other party." *Id.* The court must "scrutinize a debtor's expenses, and make downward adjustments where necessary, so as to ensure that the debtor's expenses are reasonable." *In re Felske*, 385 B.R. 649, 655 (Bankr. N.D. Ohio 2008).

Disposable income is "defined generally as that income received by a debtor which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." *Scarberry*, 428 B.R. at 408. "Whether an expense is reasonably necessary is dependent on the individual circumstances of each case." *Id.* To see if the UST has met its burden, the Court must determine Debtors' monthly income and whether any of their reported monthly expenses should be adjusted to accurately calculate Debtors' disposable income.

**B. Debtors' Honesty.**

The UST has not challenged Debtors' honesty, but the Court will address briefly whether the totality of the circumstances demonstrate that Debtors have been honorable and undeceptive in their dealings with their creditors and the Court. *Krohn*, 886 F.2d at 126. "Factors that may be relevant to ascertaining a debtor's honesty include the debtor's forthrightness in preparing and filing his schedules and other documents, whether he has made substantial purchases on the eve of bankruptcy, and whether the Chapter 7 filing was caused by unforeseen or catastrophic events." *In re Weixel*, 494 B.R. 895, 901–02 (B.A.P. 6th Cir. 2013).

A review of Debtors' schedules, filings, and testimony leads the Court to conclude that Debtors have been reasonably forthright. As stated above, the Court perceived Debtors to be credible and honest witnesses at the evidentiary hearing. While the Court finds certain expenditures have not been accurately calculated on Debtors' Schedule J as explained below, the Court does not find Debtors have been dishonest. Indeed, as the parties demonstrated in their briefs and at the evidentiary hearing, there is room for debate on some expenses. Ultimately, the Court's view is that Debtors are a hard-working couple who have faced financial challenges stemming from Nathan's most recent job loss and are doing their best to provide for their family.

**C. Debtors' Neediness.**

Next, the Court must consider whether Debtors are '"needy' in the sense that [their] financial predicament warrants the discharge of [their] debts in exchange for liquidation of [their] assets." *Krohn*, 886 F.2d at 126 (citation modified). To do so, the Court must ascertain Debtors' disposable income. As opposed to Debtors' honesty, their "neediness" is in dispute.

**1. Debtor Nathan Workman's Income and Bonus.**

The analysis begins with Debtors' monthly income. Nathan is eligible to receive a quarterly bonus at work if his employer meets certain performance goals. The parties disagree on whether to include Nathan's possible future quarterly bonuses in the income computation.

"When assessing a debtor's 'disposable income,' all sources from which a debtor derives income must be considered." *In re Jacob*, 447 B.R. 535, 543 (Bankr. N.D. Ohio 2010); *see also Hamilton v. Lanning*, 560 U.S. 505, 524 (2010) ("the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation."). However, "income projections must be based on concrete evidence of financial progress and must not be speculative, conjectural or unrealistic." *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 482 (Bankr. E.D. Mich. 1995) (citation modified). While future bonuses are inherently speculative, courts have included them in a debtor's disposable income calculation when there has been a consistent history of the debtor receiving them. *See*, *e.g.*, *Jacob*, 447 B.R. at 544 (including a debtor's year-end bonus as disposable income when he had received it for six years); *In re White*, Case No. 15-30295, 2015 WL 6733878 (Bankr. N.D. Ohio Nov. 3, 2015) (finding a debtor's year-end bonus could be included as disposable income as he had received it for five years); *In re Klinger*, No. 18-33456, 2021 WL 955928, at *7 (Bankr. N.D. Ohio Mar. 12, 2021) (collecting cases and concluding debtor's year-end bonus could be considered part of his income as he had a long, uninterrupted history of receiving them).

In this case, Nathan has received only two bonuses in disparate amounts ($1,462.24 and $244.70) since his current employment began in September 2025. The UST asserts that because Nathan has received a bonus for every quarter in which he was eligible to do so, his potential bonuses must be calculated into his disposable income. The UST submitted a projected calculation of Nathan's future income that estimates his future quarterly bonuses as $853—the average of the two bonuses received—and proposes Debtors' monthly income be increased to $8,480 when taking projected bonus income into account. [ECF No. 46-2.] The UST offered Mr. Wright's testimony to support its position, and he stated Debtor's past bonuses are the only way to reliably calculate any bonuses he may receive in the future. On cross-examination, however, Mr. Wright conceded his initial calculations based on Nathan's receipt of one bonus [ECF No. 39-24] were incorrect in light of Nathan's second bonus. Mr. Wright also did not verify or consider whether APAX would be able to meet its income targets and thus could not predict whether Debtor would receive future bonuses.

Debtors argue Nathan's possible receipt of future bonuses is too speculative to include in the disposable income calculation. To explain this view, Nathan testified to the volatility of employment in the software field. Specifically, he stated he has worked for five different employers since 2018, each job change resulted from a reduction in workforce and not because of any performance issues on his part, and technological advancements are making work in his field less available and certain. His testimony was unrebutted.

Based on the evidence presented, the Court finds the possibility that Nathan may receive future bonuses and the amount of said bonuses is too speculative at this point in Nathan's employment with APAX to include bonus income in computing Debtors' monthly disposable income for purposes of § 707(b)(3)(B). Any future bonuses he may receive are part of a profit-sharing distribution and are not based solely on Nathan's performance at work. Whether Nathan

will receive a bonus in the future is dependent on his employer's profitability and is essentially out of his control. The UST offered no evidence about APAX's historical payment of quarterly bonuses to establish it consistently pays out such bonuses to employees. There is no evidence in the record as to its practices, historical financial performance, and ability to pay bonuses other than that Nathan received bonuses of varying amounts in the two quarters in which he was eligible. Further, while Sixth Circuit courts have considered future potential bonuses in their disposable income calculations, in those cases the debtors had received bonuses consistently for years. Here, Nathan only received two quarterly bonuses after about one year of working for APAX and his employment in the software development field has been remarkably unstable.

Accordingly, the Court will not consider Nathan's potential bonus income in its calculation of Debtors' monthly disposable income. The Court adopts Debtors' most recent Schedule I calculation of their income and finds, for the purposes of this Memorandum Opinion, that their combined monthly income is $8,051.87.[5]

**2. Debtors' Expenses.**

Most of the disputed issues in this case relate to the classification and calculation of Debtors' expenses. For the reasons stated below, the Court is persuaded by several of the UST's arguments and evidence concerning certain needed adjustments to Debtors' expenses. The UST established Debtors have overstated their actual and legitimate expenses, thereby artificially reducing their monthly disposable income.[6]

---

[5] Even when excluding potential bonus income from the equation, Debtors' annual income of $134,290 far exceeds the median income level in Kentucky for a family of three, which (as stated in Debtors' Statement of Current Monthly Income) was $83,027 as of the petition date. [ECF No. 12 at 40.]

[6] "[T]he totality of the circumstances standard for dismissal under § 707(b)(3)(B) is not conducive to absolutes, and issues presented to the Court must be assessed on a case-by-case basis." *In re Beckett*, 442 B.R. 638, 644 (Bankr. N.D. Ohio 2010). The Court has reached its conclusions on Debtors' disposable income through an intensive analysis of the specific facts in this case. Similar expenses in cases with different facts may yield a contrary ruling. Therefore, the Court's findings on these specific issues should not be considered *per se* binding precedent for any future § 707(b)(3) motions that may be filed with this Court.

**a. Medical and Dental Expenses.**

Debtors' Schedule J states they spend $940 per month for medical and dental expenses. [ECF No. 33 at 5.] Debtors calculated this amount based on an assortment of separate expenses, including their monthly payments to Baptist Health and Nathan's anticipated expenses for future dental work. [ECF No. 38 at ¶¶ 14-15, 33-34.] Reviewing the payments evidenced on Debtors' bank statements, however, the UST calculates Debtors pay, on average, $483 per month for medical expenses. The UST argues Debtors misunderstand their insurance coverage and that while Nathan may incur a substantial dental expense in the future, Debtors have not accounted for that anticipated expense properly on their Schedule J. The UST contends that, considering Debtors' current medical debt payments, anticipated dental payments, and historic spending, a more accurate calculation of Debtors' allowable out-of-pocket monthly medical and dental expenses on Schedule J would be $669.[7]

At the hearing, Debtors offered testimony and exhibits about their medical expenses and insurance deductibles, including that their out-of-pocket maximum yearly expense for medical bills (which does not include dental bills) is $10,000. [ECF Nos. 49-1, 49-2.] Nathan also explained his anticipated future dental expenses would be due at the time of service, and his dental provider does not allow for payment plans.[8]

"When evaluating medical expenses, courts have consistently allowed monthly medical expenses greater than the IRS Standards if the debtors can provide documentary evidence of

---

[7] This amount consists per month of $414 to Baptist Health, $180 actual spending at other medical suppliers, and $75 for Nathan's anticipated dental expenses. [ECF No. 40 at ¶ 42.]

[8] Nathan did not testify as to what kind of dental procedure(s) or treatment he anticipated, and the documentary evidence provided does not reveal this. Accordingly, the Court lacks information to discern the clinical purpose of the dental procedures, *i.e.*, whether they are urgent and medically necessary, preventative, or cosmetic in nature. While parties are entitled to respect for their medical privacy, declining to provide the information left the evidentiary record devoid of needed and appropriate context under the circumstances.

those expenses." *In re Martin*, No. 10-64790, 2013 WL 6196566, at *10 (Bankr. N.D. Ohio Nov. 27, 2013). It also is not unusual for debtors to allocate payments on medical debts over several months to allow for an accurate picture of their Schedule J expenses. *In re Lang*, No. 07-31744, 2007 WL 2777770, at *3 (Bankr. N.D. Ohio Sept. 24, 2007).

In this case, the UST submitted several summaries and exhibits to establish: (1) from December 24, 2025, to June 24, 2026, the six-month period prior to the petition date, Debtors had medical-related expenditures of $2,899.35 for a monthly average of approximately $483 [ECF No. 39-6]; (2) Debtors made pre- and post-petition emergency room visits to Baptist Health and were billed accordingly [ECF Nos. 39-17, 39-21]; and (3) Nathan's dental provider estimates several thousands of dollars in charges for future dental work, but this estimate appears subject to change based on the timing of the procedures. [ECF No. 39-22.] In contrast, Debtors presented their testimony and the aforementioned exhibits establishing their out-of-pocket maximums and deductibles. Even with this testimony and these exhibits, however, it still is not completely clear the extent to which Debtors' insurance will cover any future medical or dental expenses, and Debtors did not establish a valid basis for the amount listed on Schedule J for their monthly medical expenses. On the other hand, the UST presented sufficient evidence, based on Debtors' records, to establish the expense amount is overstated on Debtors' Schedule J.

As Debtors' monthly medical expenses are more modest than reported on their Schedule J, their allowed expenses for this expenditure will be reduced accordingly. The Court finds Debtors' allowed medical and dental expenses must be reduced from $940 to $743 per month.

**b. Priority Taxes.**

Debtors owe $4,209 in total on past-due state and federal income tax debts. [ECF No. 38 at ¶ 27.] Debtors' Schedule J states they pay $300 per month to address these debts. [ECF No. 33 at 5.] While the UST avers the debt should be spread out over the course of a hypothetical sixty-

month chapter 13 plan term, which would reduce this monthly expense from $300 to $70, Debtors assert they must pay these priority debts in full through a chapter 13 plan, meaning those funds would not go to their unsecured creditors, which bears on a totality-of-the-circumstances assessment of their finances.

While there does not appear to be a consensus on how priority unsecured tax debts should be accounted for in the context of a § 707(b)(3)(B) motion, at least one court in the Sixth Circuit has spread out the payment obligation over a sixty-month period when determining whether a chapter 7 case should be converted or dismissed under § 707(b). In that case, the debtors budgeted $490 per month to pay for a $13,000 unsecured priority tax debt. *In re Swanbeck*, No. 07-33276, 2008 WL 2388125, at *3 n.3 (Bankr. N.D. Ohio June 6, 2008). The court explained: "[t]his payment could likely be reduced by approximately $270 if paid over a sixty-month period, a time period that coincides with the applicable commitment period of a Chapter 13 plan for above median income debtors such as the [debtors]." *Id.*

As in *Swanbeck*, Debtors could significantly reduce their monthly payments on their priority tax debts if spread over the term of a hypothetical chapter 13 plan, and doing so establishes a more accurate snapshot of Debtors' financial situation for purposes of this Motion. Debtors presented no case law or evidence to show a different treatment of this tax debt is warranted. The Court thus finds the UST's position to be persuasive and will reduce Debtors' monthly payments on their tax debt to $70.

**c. Student Loans.**

Debtors' Schedule J states they pay a combined $308 each month on their student loans. [ECF No. 33 at 5.] Similar to their priority tax debt argument, Debtors aver that removing this monthly expense from their Schedule J for purposes of this Motion is inapt as they will be allowed to make payments on this debt while in chapter 13, and thus their unsecured creditors

will not receive an increased recovery if the case were converted. In contrast, the UST asserts student loan debts, while generally non-dischargeable, are not given priority treatment in chapter 7 and courts in this circuit have barred debtors from claiming any student loan debt payments on their Schedule J when evaluating § 707(b) motions. The UST argues Debtors' $308 monthly payments for their student loans should be reduced to $0 for purposes of this Motion.

As the Sixth Circuit previously explained, "ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws." *XL/Datacomp, Inc. v. Wilson (In re Omegas Grp., Inc.)*, 16 F.3d 1443, 1453 (6th Cir. 1994). Here, Debtors seek to deduct their student loan payments from their monthly disposable income without making similar payments to other unsecured creditors. In essence, for purposes of the § 707(b)(3)(B) totality-of-the-circumstances analysis, they claim entitlement to pay their student loan debts from what otherwise would be disposable income, thereby preferring a subset of unsecured creditors over other unsecured creditors in their chapter 7 case.

Courts in this circuit have determined that it is impermissible for a debtor to give non-dischargeable student loans such preferential treatment. *See*, *e.g.*, *In re Baker*, 400 B.R. 594, 599 (Bankr. N.D. Ohio 2009). "[T]he nondischargeability of a student loan is not, without more, a basis to permit a debtor to treat the student loan creditors more favorably than other unsecured creditors." *In re Robinson*, No. 14-32889, 2015 WL 1087316, at *3 (Bankr. N.D. Ohio Mar. 9, 2015). "To treat certain unsecured creditors more favorably simply because they hold a nondischargeable claim would elevate such claims to a priority status that was not intended by Congress." *In re Rooney*, 436 B.R. 454, 459 (Bankr. N.D. Ohio 2010).

A small minority of courts has allowed debtors to reduce their disposable income to pay their student loan debt under special circumstances, "such as overwhelmingly large student loans juxtaposed with a small remainder of other unsecured debts." *Baker*, 400 B.R. at 600; *see*, *e.g.*,

*In re Thurston*, No. 07–35092, 2008 WL 3414138, at *5 (Bankr. N.D. Ohio Aug. 8, 2008) (permitting preferential treatment of student loan debt of $160,000 out of $180,000 in unsecured debt). But Debtors did not prove special circumstances exist that justify allowing them to deduct their student loan payments from their disposable income for purposes of the present analysis. Debtors' Schedule E/F establishes their student loan debt totals $55,073 of their $174,372.22 in unsecured nonpriority debt. [ECF No. 12 at 23.[9]] Debtors' student loans therefore comprise 32% of their unsecured debts, which is not a high enough proportion to justify preferential treatment, nor is the debt so overwhelmingly large to warrant such treatment. *See Baker*, 400 B.R. at 600 (finding debtor's $35,000 student loan debt was not entitled to preferential treatment when she had $15,000 in other unsecured debt and "her student loan obligations are not of such magnitude that she cannot repay them over a reasonable period of time.").

Beyond the non-dischargeable nature of the debt, Debtors have not presented any evidence to show these payments should be deducted from their disposable income for purposes of § 707(b)(3)(B), and the Court sees no reason to depart from the well-established precedent on the issue in the Sixth Circuit. Therefore, Debtors' monthly student loan payment expense will be reduced to $0 for purposes of recalculating their disposable income.

**d. Second Vehicle.**

Debtors' Schedule J also budgets $600 per month to pay for a second vehicle. [ECF No. 33 at 5.] They contend having only one vehicle has forced them to reschedule medical appointments and to rely on family and rideshare transportation. The UST disagrees that a second vehicle is a necessary expense for Debtors given that Sarah does not work outside the home and Nathan often works from home.

---

[9] As noted above, the Court may take judicial notice of records in its own docket.

"For purposes of an ability to pay analysis under § 707(b)(3), a debtor's disposable income is defined generally as that income received by a debtor which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." *In re Hoke*, 447 B.R. 835, 837 (Bankr. N.D. Ohio 2011). "[I]n its role as the trier-of-fact, the Court may make downward adjustments in a debtor's expenses where it is determined that such expenses are not reasonably necessary." *Id.* at 837-38. Here, the Court finds that, while Debtors previously had a second vehicle, they did not show a second vehicle is reasonably necessary for them for purposes of § 707(b)(3)(B). Indeed, they offered no evidence of their use of ride-sharing services, or of any other expenses they have incurred due to not having a second vehicle—let alone establish these expenses approach or exceed $600 per month. They offered only non-specific anecdotal testimony about rescheduling appointments or relying on family to provide transportation. As the parties stipulated, however, Nathan works from home for some portion of every week, and Sarah does not work outside the home—suggesting one vehicle is sufficient for their family's needs under the present circumstances.

Moreover, Debtors offered no evidence as to why they perceive an appropriate monthly expense for a second vehicle would be $600. They did not identify any particular vehicle they might buy, what it might cost, and what their financing terms might look like. They did not discuss what they may look for in a vehicle in terms of size or other attributes, or why a vehicle at a lower price than $600 per month would not suffice. No evidence in the record allows the Court to find this expense to be reasonable.

In the face of the UST's position and related evidence, Debtors did not establish the reasonable necessity of this monthly expense. The Court will reduce this expense to $0.

**e. Childcare and Children's Education Costs.**

On their Schedule J, Debtors claim a monthly expense of $125 for their child's education costs and childcare. [ECF No. 33 at 5.] As Sarah is not employed outside of the home, "Debtors do not have traditional third-party childcare expenses." [ECF No. 38 at ¶¶ 5, 12-13.] This claimed expense is for dance instruction and gymnastics classes for Debtors' daughter. [*Id.* at ¶¶ 10-11.] The UST contends these payments should not be categorized as education costs and childcare, while Debtors aver they do constitute education costs within the meaning of Schedule J as they are of educational value for their daughter. Sarah persuasively explained their daughter had been involved in gymnastics since she was very young, and these costs represented a continuing dedication to that activity.

"BAPCPA [ ] permits a debtor to deduct additional expenses for . . . certain educational expenses, so as long as the debtor demonstrates that those additional allowances are reasonable and necessary." *Schultz v. United States*, 529 F.3d 343, 347 n.2 (6th Cir. 2008). Further, § 707(b)(2)(A)(ii)(IV) allows debtors to spend up to $2,575 for a dependent child's education. Finally, the determination of whether an expense is considered reasonable is to be decided on a case-by-case basis and requires consideration of the debtor's specific circumstances. *In re Tucker*, 389 B.R. 535, 539 (Bankr. N.D. Ohio 2008).

After Nathan lost his job in early 2025, Debtors stopped paying for gymnastics classes due to their financial situation. Debtors did not re-enroll their daughter in gymnastics classes, or commence dance classes, until after the petition date in 2026. [ECF Nos. 39-19, 39-20.] This fact supports the argument that these are discretionary expenditures. However, based on the factual record in this case and the relatively modest cost of these classes, the Court finds these expenditures to be acceptable for purposes of § 707(b)(3)(B), and the Court will not excise these costs from Debtors' budget.

**f. Entertainment Expenses.**

Debtors' Schedule J states they spend $200 per month on "[e]ntertainment, clubs, newspapers, magazines, and books." [ECF No. 33 at 5.] The UST asserts that $100 per month is more appropriate. In addition, and in contrast to its other arguments, the UST contends this reported $200 expense is over $600 less than Debtors' actual monthly entertainment costs based on their historical spending. To support this view, the UST provided several exhibits concerning Debtors' post-petition spending on amusement parks, video games, and other entertainment items. [ECF Nos. 39-8, 39-9, 39-10.]

Debtors contend this "excessive spending" argument is inapt, arguing the UST misrepresented a holiday-season snapshot of their finances as reflective of their normal spending habits. During the cross-examination of Mr. Wright at the evidentiary hearing, Debtors also challenged the classification of some of their purchases at superstores such as Costco as entertainment expenses, and posited certain purchases from Apple were for educational applications for their daughter (which they had not categorized as educational expenses on Schedule J). Debtors argue the UST's misclassification of expenses makes the related calculations and exhibits suspect.

The UST established at the hearing that its calculations of Debtors' purchases commenced on December 24, 2025—after Debtors admitted their Christmas shopping already had been completed. Debtors also conceded they spent over $1,000 to celebrate their daughter's birthday in March 2026, paying for a birthday party at Malibu Jack's and for a trip to Great Wolf Lodge, a family-focused resort hotel with an indoor water park. While Debtors successfully established there may be room for debate on the classification of some expenses, the Court finds the UST introduced sufficient evidence establishing Debtors significantly understated their actual monthly spending on entertainment while in bankruptcy on their Schedule J. "[B]ankruptcy

relief, while not requiring a debtor to live in poverty, may require a debtor to engage in 'good, old-fashioned belt tightening."' *In re Kaminski*, 387 B.R. 190, 199 (Bankr. N.D. Ohio 2008) (citation omitted); *see also In re Floyd*, 534 B.R. 729, 738 (Bankr. N.D. Ohio 2015) (finding debtor was ineligible for chapter 7 relief when she had a "a stable source of future income and c[ould] further reduce her expenses through belt tightening without deprivation of reasonable expenses for food, shelter, clothing, and other necessities."); *In re McClellan*, 428 B.R. 737, 744 (Bankr. N.D. Ohio 2009) (holding while bankruptcy law does not require a debtor to live a "monastic lifestyle," they are "are expected to do some financial belt tightening and may be required to forgo amenities to which they had been accustomed.").

Ultimately, while the UST contends Debtors' budget for entertainment on Schedule J should be reduced from $200 to $100, a $200 per month entertainment expense for Debtors' three-person family is appropriate for purposes of § 707(b)(3)(B). The problem here is not the budgeted amount—it is that Debtors did not live under a $200 per month budget for entertainment expenses post-petition. Under a § 707(b)(3)(B) totality of the circumstances analysis, Debtors have not spent reasonably on entertainment while in bankruptcy, a fact the Court considers in deciding this Motion.

**g. Miscellaneous Expenses.**

Debtors claim monthly expenses totaling $1,725 for their food and housekeeping supplies, apparel and services, and personal care products and services (collectively referred to as "household goods"), $325 for transportation, and $220 for attorney's fees. [ECF No. 33 at 5.] The UST also takes issue with these reported expenses.

Much like their entertainment expenses, the UST asserts Debtors have understated their expenses for household goods and they spend, on average, $3,367 each month on these items. [ECF No. 39-4.] The UST therefore avers Debtors' Schedule J estimation is inaccurate and their

budget for these expenses should be reduced to $1,432 to be in line with the IRS National Standards. [ECF No. 39-3.] Debtors maintain their Schedule J estimation is reasonable for a three-person household and, at the evidentiary hearing, cross-examined Mr. Wright with the intent to establish the UST misclassified purchases as being for household goods.

"[A]s a pole for guidance, the expense figures provided in the 'means test' can be helpful when determining the reasonableness of a debtor's expenses under § 707(b)(3). . . . As a practicable matter, therefore, when a debtor's [proposed allowance] significantly exceeds the IRS allowance, a viable justification for the necessity and reasonableness of that [allowance] should be offered." *Kaminski*, 387 B.R. at 196 (citation modified). Here, Debtors have not provided a persuasive justification for spending more than the IRS standards allow for household goods. While Debtors attacked how the UST classified their expenses for purposes of the Motion, Debtors offered no evidence of misclassification and, rather, sought to benefit from their own inability to provide receipts to the UST to establish the purpose of their expenditures.

Next, from its investigation using Debtors' bank records, the UST argues Debtors spend, on average, approximately $150 on gas and $48 on other automotive expenses per month, for a total cost of $198 for transportation expenses, not $325 as budgeted. [ECF No. 39-7.] While Debtors' pre-hearing brief offered argument in opposition to this calculation, they provided no proof at the evidentiary hearing to rebut the UST's calculation or to justify their Schedule J estimation. The Court is persuaded the UST's calculation is accurate.

Finally, the parties stipulated Debtors entered into a fee agreement with their counsel to represent them in this case for $2,200 and that the last $220 monthly payment will be made in October 2026. [ECF No. 38 at ¶¶ 29-30.] The UST therefore avers that, since this debt will be repaid soon, this amount should be reduced to $0 to reflect that change. Nathan testified, however, that while their initial legal fees will be paid off next month, they will need to make

additional payments given the other services their counsel has provided in this case and thus this allowance should remain the same. But Debtors did not provide any evidence of what they will need to pay their counsel after October 2026 (in total or per month), nor was a copy of the fee agreement or any other documentation introduced to establish their future costs. Accordingly, the UST's position on this expense carries the day.

## IV. CONCLUSION.

Abuse under § 707(b)(3) can be predicated upon want of need. *Krohn*, 886 F.2d at 126. As the findings above reflect, Debtors are not "needy." While Debtors reported their disposable income to be $46.29, the Court finds and concludes it is $2,051.87 for purposes of § 707(b)(3)(B). In other words, when their expenses are right-sized, Debtors have a sizable monthly disposable income that would allow them to make a meaningful distribution to their creditors under a chapter 13 plan. The UST has established that, pursuant to 11 U.S.C. § 707(b)(3)(B), it would be an abuse of the bankruptcy system to allow this case to proceed under chapter 7.

For the foregoing reasons, IT IS ORDERED that Debtors are allowed 14 days from the date of this Memorandum Opinion to file a motion to convert this case to chapter 13. If Debtors do not file such a motion, the UST's Motion [ECF No. 24] will be GRANTED without further notice or hearing, and this case will be dismissed by a separate order.



---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**

**Signed By:**
***Douglas L Lutz***
**Bankruptcy Judge**
**Dated: Monday, October 5, 2026**
**(dll)**